IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| FRIENDS OF ANIMALS, and PROTECT MUSTANGS,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>THE UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the United States,<br><br>　　　　　Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:15-cv-00118-CW<br><br>Judge Clark Waddoups |

**INTRODUCTION**

This matter is before the court on Plaintiffs Friends of Animals and Protect Mustangs' Motion for Preliminary Injunction and/or Temporary Restraining Order. (Dkt. No. 8). A hearing on Plaintiffs' motion was held before the Honorable Clark Waddoups on February 24, 2015. Joel Ban and Michael Harris appeared on behalf of Plaintiffs, and Jared Bennett and Luther Hajek appeared on behalf of Defendant. For the reasons stated below, Plaintiffs' motion is DENIED.

**BACKGROUND**

The Bureau of Land Management ("BLM") has jurisdiction over all wild free-roaming horses and burros for the purpose of management and protection under the Wild Free-Roaming Horses and Burros Act of 1971. *See* 16 U.S.C. § 1333 (2012); 43 C.F.R. 4700.0-1 (2015). The BLM's Cedar City Field Office is responsible for certain public lands in Iron and Beaver Counties in Utah, which include the Sulphur Herd Management Area ("SHMA"). The Pinyon Management

Framework Plan of 1983, one of the applicable Land Use Plans governing management of that area, allows for "the removal of horses as required to maintain horse numbers at or below 1982 inventory levels, but no less than 1971 levels." (Dkt. No. 8, p. 32). This serves as the basis for the herd's Appropriate Management Level ("AML") of not less than 135 and no more than 180 horses. (Dkt. No. 8, p. 44). As a practical matter and for purposes of correctly counting animals eligible to be removed, the BLM's goal is to maintain the herd at 250 animals.

In order to stay within those limits, the BLM has conducted periodic removals on a two to three year cycle from 1987 to 2006. More recently, the BLM conducted an Environmental Assessment ("EA") in 2008 analyzing the removal of 350 horses, and in 2010 analyzing the capture of 250 horses, the application of fertility control, and subsequent re-release of 220 horses. To achieve the objective of the Plan, regular removal is necessary because the size of the herd will double every three to four years due to survivability rates above 95%. Wild horses appear to have few, if any, natural predators. Despite the removals, the herd is presently considerably above the AML, with approximately 830 horses in the SHMA.

The BLM has been experiencing issues with horses leaving the SHMA and going onto Highway 21. There are currently around 80 horses within a quarter of a mile of the highway, which constitute a potential threat to oncoming vehicles. In fact, since December 2013, the BLM has discovered three horses that have been hit and killed by vehicles on the highway. BLM's attempts to divert the horses from the area by means other than removal have been unsuccessful. To address the safety issue, the BLM posted a notice and information on its online Environmental Notice Bulletin Board about its plan to gather SHMA horses on December 3, 2014. Then, on January 12, 2015, it issued a Decision Record authorizing the removal of approximately 100 wild horses from a part of the SHMA adjacent to Highway 21. The Decision Record noted that the

2

public could file any appeals with the Interior Board of Land Appeals within 30 days from the date it was issued.

The BLM issued a press release about the upcoming gather on February 13, 2015, noting that it was scheduled to begin on February 26, 2015. Because of inclement weather concerns, including high winds that would make the flying of helicopters unsafe, the BLM rescheduled the roundup operations to start on February 25 instead. They will take approximately two days to complete. As the BLM does not conduct gathers during the wild horse foaling period (from March to July), if they are unable to proceed as scheduled, the horse gathering would be faced with a six month delay.

Plaintiffs state that they only learned about the roundup on February 21, 2015. They filed a complaint on February 24, 2015, challenging the agency's decision to round up the horses as a violation of the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA"). They also seek a preliminary injunction and/or temporary restraining order against the BLM. They contend that if the BLM proceeds with the removal, they would lose their intimate connection with horses that are removed, that they would be devastated by the loss of 100 horses, and that their recreational, aesthetic, and professional interest would be permanently injured and significantly lessened by their removal. In addition, they cite concerns with the potential trauma and physical harm that horses would suffer from the roundup.

## ANALYSIS

The standard for preliminary injunctions and temporary restraining orders is the same. *Bachman ex rel. Bachman v. W. High Sch.*, 900 F. Supp. 248, 250 (D. Utah 1995) *aff'd*, 132 F.3d 542 (10th Cir. 1997).To obtain a preliminary injunction, the movant must show: "(1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied;

(3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *General Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). Because a preliminary injunction is an extraordinary remedy, "it is the exception rather than the rule." *Id.* Accordingly, it should only be granted when the right to relief is "clear and unequivocal." *Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 (10th Cir. 2006).

**I. Likelihood of Success on the Merits**

Plaintiffs contend that the BLM's January 12, 2015, decision to authorize the removal of approximately 100 wild horses from the SHMA is in violation of NEPA. Specifically, they contend that the agency erred in relying on past EAs from 2008 and 2010 instead of undertaking a new or supplemental EA for the removal action in question. The BLM contends that no additional EAs are necessary because the circumstances and impact of the present removal are substantially the same as those analyzed in the earlier EAs.

Judicial review of agency action is governed by the APA, which states that a court shall "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A) (2012). The Supreme Court has identified the following four circumstances where an agency decision is arbitrary and capricious:

> [I]f the agency has [1] relied on factors which Congress has not intended it to consider, [2] entirely failed to consider an important aspect of the problem, [3] offered an explanation for its decision that runs counter to the evidence before the agency, or [4] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

A "presumption of validity attaches to the agency action," with the burden of proof resting on the party challenging such action. *Colo. Health Care Ass'n v. Colo. Dep't of Soc. Servs.*, 842 F.2d 1158, 1164 (10th Cir.). When reviewing an agency's factual determinations, the court must evaluate "whether the agency took a 'hard look' at information relevant to the decision." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009). Because "[t]he NEPA process involves an almost endless series of judgment calls . . . . The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts." *Coal. On Sensible Transp. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987). Accordingly, the court's task is not to determine whether the BLM's decision was ultimately correct, but whether the decision was made in the right way.

NEPA is intended to foster (1) informed agency decision-making and (2) informed public participation in the agency decision-making process. *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1177–78 (10th Cir. 2008). Under NEPA, an agency's factual determinations must have been made after "the agency took a 'hard look' at information relevant to the decision." *New Mexico ex rel. Richardson*, 565 F.3d at 704. "When an agency takes the requisite 'hard look' and 'determines that the new impacts will not be significant (or not significantly differently from those already considered), then the agency is in full compliance with NEPA.'" *Summit Lake Paiute Tribe of Nev. v. United States BLM*, 496 Fed. Appx. 712, 715–716 (9th Cir. 2012).

The BLM's decision authorizing the removal of the horses includes a "Determination of NEPA Adequacy" that the current proposed action is substantially the same as those previously analyzed in the 2008 and 2010 EAs. The information contained in the 2008 and 2010 EAs

supports a conclusion that the BLM took the requisite "hard look" at the relevant data. To begin with, the scope of the 2008 EA is broad. In its identification of issues, it specifically notes that "[w]ild horses have expanded outside of the HMA in search for forage, water, and cover." (Dkt. No. 8, p. 48). This is the exact concern that the BLM is addressing with the proposed gather, given that the overpopulation of horses has resulted in overgrazing and reduced forage, which in turn attracts horses to the grass growing on the side of the highway. Moreover, the 2008 EA anticipates its information serving as the basis for "Reasonably Foreseeable Future Actions," noting that "[f]uture removals within the Sulphur HMA would utilize this information and provide baseline data for future NEPA analysis." (Dkt. No. 8, pp. 76–77).

      The scenarios considered by the EAs are directly relevant to the present action. The Determination notes that the 2008 and 2010 EAs analyzed the same gather and removal methods that are going to be used in the proposed roundup. Both involved situations where more horses (350 and 250 respectively) were to be removed. Since the current removal is only for 100 horses, the agency states that it expects the impacts to fall well within the range described in the 2008 and 2010 EAs. This is because there is no new information or circumstances that would convey a different picture of the affected environment. Notably, Plaintiffs have not alleged that there have been any changes in the circumstances of the 2008 and 2010 EAs that would require additional supplementation. The changes that have occurred since—including the continued increase in the wild horse population, the accompanying increases in demand on rangeland resources, etc.—were both anticipated and discussed in the EAs. As such, the alternatives analyzed in the EAs, as well as the direct and indirect impacts they discussed, are fully applicable to the proposed action and provide sufficient basis for a conclusion that the BLM has not acted arbitrarily or capriciously. Accordingly, the court concludes that Plaintiffs are unlikely to succeed on the merits of their

claims.

**II. Irreparable Harm**

A plaintiff seeking preliminary relief must demonstrate that irreparable injury is likely in the absence of an injunction. *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). In this case, Plaintiffs contend that the loss of 100 horses in the SHMA will cause irreparable harm by preventing them "from being able to continue to view, study, and photograph, horses and bands they have come to know and enjoy." (Dkt. No. 8, p. 12). This is highly unlikely because there are still going to be at least 730 horses left after the roundup is completed. In fact, the 2008 and 2010 EAs specifically note that the herd will remain the same, and will actually benefit by the reduction in size.[1] (Dkt. No. 8, pp. 68, 142, 149–50). They also argue that once the project is completed, the horses in the SHMA will individually and collectively be different than those with which they have intimate relationships today. The problem with this contention is that any harm suffered by Plaintiffs would be for having 100 less horses, which does not constitute a cognizable harm. Insofar as the Land Management Plan limits the herd to no more than 180 horses,[2] and a reduction of 100 horses would not bring the herd below that limit, Plaintiffs can have no legal entitlement to those horses.

Plaintiffs' allegations that roundups cause severe damage and often lead to death of wild horses are unsubstantiated and without evidence. They are also directly contradicted by the 2008 and 2010 EAs, which note that there are no indications that the impact from handling stress persist beyond a short time following the stress event and is expected to completely dissipate following release, and that the mortality rate averages only one half of one percent. (Dkt. No. 8,

---

[1] Specifically, the 2008 EA found that "A reduction of wild horses would result in protecting wild horses from their own proliferation and consequently the associated habitat loss resulting from overpopulation. Reduced competition for forage and water between livestock, wildlife and wild horses would help to result in an improved ecological balance by avoiding range deterioration." *Id.* at 68.
[2] Plaintiffs have not challenged the validity of the Land Management Plan or the AML.

pp. 66, 148). Indirect impacts such as spontaneous abortions in mares are also very rare. *Id.* In fact the 2008 EA notes that "[w]ith the exception of changes to herd demographics, direct population-wide impacts have proven, over the last 20 years, to be temporary in nature with most if not all impacts disappearing within hours to several days of release." (Dkt. No. 8, p. 66). Plaintiffs have simply not demonstrated that substantial injury to the horses is likely.

**III. Balance of the Injuries**

Plaintiffs have not shown that they will suffer an irreparable injury as a result of the removal. On the other hand, granting the preliminary injunction and/or temporary restraining order would impose a significant hardship on the BLM, who would be forced to postpone the removal until July. This is compounded by the fact that the BLM has already amassed expenses in preparation for the roundup. Plaintiffs' delay in filing their motion until the eve of the gathering significantly exacerbated the potential harm the BLM would suffer in the event they were enjoined and provides independent grounds for denying their motion. The egregiousness of the delay becomes clear by the fact that the BLM provided notice of its intent to remove horses in the SHMA as early as December 3, 2014. The BLM then published its Decision Record on January 12, 2015 and provided for the filing of appeals within thirty days. Finally, the BLM issued a press release on February 13, 2015 specifying the actual date the removal was to take place. The court concludes that the BLM provided adequate notice, and any threatened injury alleged by Plaintiffs does not outweigh the harm that an injunction would have on the BLM.

**IV. Public Interest**

The public interest weighs heavily against granting the preliminary injunction and/or temporary restraining order. The BLM has adequately shown that delaying the roundup until July would lead to a worsening problem with horse overpopulation in the SHMA, an increased

deterioration of the environment, and a greater potential for human accidents. The fact that approximately 80 horses were recently observed within a quarter of a mile from the highway underscores the severity of the problem. The public has an interest in the safety of highways and the surrounding community. Since a reduction in horses is actually beneficial for the herd and serves to preserve the area, the public interest will be best protected by the denial of Plaintiffs' motion.

## CONCLUSION

It is therefore ORDERED that Plaintiffs' Motion for Preliminary Injunction and/or Temporary Restraining Order (Dkt. No. 8) is DENIED.

DATED this 25th day of February, 2015.

BY THE COURT:

_____
Clark Waddoups
United States District Court Judge